IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:23-CV-01064-M-BM

MARY BETH BERGMAN,

    Plaintiff,

v.

GEORGE REESER MOFFITT, III and
MICHELE MOFFITT,

    Defendants.

ORDER

This matter comes before the court on Defendants George Reeser Moffitt, III ("Mr. Moffitt") and Michele Moffit's ("Ms. Moffitt") motion for summary judgment [DE 31]. For the reasons that follow, Defendants' motion is granted in part and denied in part.

**I. Factual Background**

In late 2019, Plaintiff Mary Beth Bergman ("Ms. Bergman") and her husband, Josh Bergman ("Mr. Bergman") began the search for a new boat. DE 32-1 at 10-11. Around the same time, George and Michele Moffitt listed their boat, a "Palmetto 33," for sale. DE 32-2 at 9. The Moffitts' Palmetto was a vessel 33 feet in length, with twin 300-horsepower engines and a center console for navigation. *Id.* at 13-15.

Using the services of a boat broker, the Bergmans connected with the Moffitts and arranged for a sea trial of the Moffitts' vessel. DE 32-1 at 10, 14. Mr. Moffitt "didn't want to do" a sea trial because "[t]he boat wasn't ready." DE 32-2 at 17. At the time, Mr. Moffitt was in the process of fixing some electronics that were not firmly fastened to the center console of the vessel. *Id.* at

18. But he decided to move forward with the sea trial because he "wanted to sell the boat." *Id.* at 17.

The Bergmans arrived at the Moffitt residence on the morning of July 3, 2020, and shortly thereafter departed on the sea trial. DE 32-1 at 15; DE 32-2 at 23. The occupants of the vessel included Mr. Moffitt, the Bergmans, the Bergman's broker, and a marine surveyor. *Id.* Ms. Bergman and the broker were seated on a bench at the helm, or front, of the vessel. *Id.* at 25. Mr. Moffitt, Mr. Bergman, and the surveyor stood around the center console. *Id.* Ms. Moffitt did not accompany the group on the sea trial. DE 32-1 at 15; *see also id.* at 46. The Moffitts had their own broker as well, but he was out of town for the weekend and did not attend the sea trial either. DE 32-2 at 17.

Although one of the brokers typically conducts the sea trial, in this case Mr. Moffitt operated the vessel. DE 33-6 at 7. There is conflicting testimony about *why* Mr. Moffitt conducted the sea trial instead of the Bergman's broker, but it is undisputed that Mr. Moffitt was operating the vessel that day. *Compare id.* at 8 (broker's testimony that Mr. Moffitt "was insistent" that he conduct the sea trial), *with* DE 32-2 at 17, 27 (Mr. Moffitt's testimony that he had to conduct the sea trial because his broker was out of town, and that he offered to let Mr. Bergman operate the vessel, but Mr. Bergman declined); *but see also* DE 33-6 at 10 (broker's testimony that she had "a torn meniscus" at the time of the sea trial).

Mr. Moffitt is an experienced boater; he has "been on the water a long time," "probably 30-some years." DE 32-2 at 7. He has experience with boats ranging from 8 to 55 feet in length. *Id.* at 8. He also took and passed a captain's course at Cateret Community College, although he did not submit the requisite paperwork in order to obtain his captain's license. *See id.* at 8-9.

There is no dispute that the boating conditions on July 3 were less than ideal. Ms. Bergman testified in her deposition that "[i]t was pretty windy," the water was "really choppy," and being that it was the day before the Fourth of July, the water was trafficked by boats of "all shapes" and "sizes." DE 32-1 at 16. Mr. Moffitt agreed that it was "[w]indy" and "choppy," but expressed that the conditions were not "crazy bad." DE 32-2 at 28; *but see id.* at 41 (later testifying that the conditions were "[v]ery choppy, very windy"). And the broker indicated that there were "[a] lot of boats" and "current coming from different directions." DE 33-6 at 10.

Mr. Moffitt navigated the vessel through Beaufort Inlet towards the Atlantic Ocean. DE 32-1 at 16. There is a factual dispute about whether the incident in question occurred while Mr. Moffitt was piloting the vessel out of Beaufort Inlet into the Atlantic Ocean, or on the way back through the inlet after returning from the ocean. *Compare id.* at 19, *with* DE 32-2 at 29. But it is undisputed that the incident occurred in Beaufort Inlet. *See id.* And it is also undisputed that the tide was going out from the inlet into the ocean at the time of the incident. *See* DE 32-2 at 29, 41-42.

As the vessel traveled through Beaufort Inlet, Ms. Bergman overheard Mr. Moffitt tell Mr. Bergman that he wanted to demonstrate how smoothly the vessel could operate in choppy waters. DE 32-1 at 18-19. For that demonstration, Mr. Moffitt started "going faster" through the inlet. *Id.* at 19. Mr. Moffitt estimated that he was "running about 25 knots," which is approximately 29 miles per hour. DE 32-2 at 30-31. Mr. Moffitt described that rate of speed as "[a] little bit over plan[ing speed]." *Id.* at 30.[1] The broker, who is also an experienced boater, observed that there

---

[1] "Planing speed is the velocity at which an accelerating ship's hull rises to the top of the water's surface." *Hines v. Triad Marine Ctr., Inc.*, 487 F. App'x 58, 60 n.3 (4th Cir. 2012).

3

were "[a] lot of boats" in Beaufort Inlet and stated that Mr. Moffitt "was driving faster than [she] would drive." DE 33-6 at 10.

Mr. Moffitt similarly testified that "there was [sic] boats coming in" through the inlet, and that he observed two large "sport fishers" passing "on each side" of the vessel." DE 32-2 at 36; *see also id.* (testimony that there was "[a] lot of boat traffic"). The two sport fishing boats passed on either side of the vessel at a point where "[t]he channel chokes in" and it was "tight." *Id.* at 37. Mr. Moffitt "observed them passing" but "didn't see anything different than what [he] always see[s]." *Id.* Mr. Moffitt continued operating the vessel at 25 knots when passing between the two sport fishing boats and did not reduce his speed. *Id.*

The broker testified that when "there's a ton of boats going by, you'll have large wake." DE 33-6 at 19. As Mr. Moffitt navigated the vessel between the two sport fishing boats, he was "talking" to Mr. Bergman "about electronics" on the vessel and could not "recall" whether that conversation "diver[ted]" his attention. DE 32-2 at 37.

The vessel then struck two large waves in rapid succession. Ms. Bergman "wasn't really looking forward to where" the vessel was "going," DE 32-1 at 21, but testified that they "caught two rogue big waves," *id.* at 19. Mr. Moffitt described the waves as "a rogue situation," "unforeseen," and that he had no idea where the waves "c[a]me from." DE 32-2 at 29-30. Because of the speed of the vessel, the broker could not see over its helm but testified that they must have hit "a big wave" for the impact "to slam [her and Ms. Bergman] like that." DE 33-6 at 18. Because there were large sport fishing boats passing nearby in Beaufort Inlet, the broker testified that Mr. Moffitt "must [have] stuffed it into a wake." *Id.* at 11.

The impact of the first wave "catapulted" Ms. Bergman off her seat, though she was "able to hold on" to a pole next to her seat. DE 32-1 at 19-20. But the second wave "threw" Ms.

4

Bergman up and she "lost [her] grip on the pole and ended up" on the deck of the vessel, at which point Mr. Moffitt "killed the engines" and "got control" of the vessel again. *Id.* at 20; *see also* DE 33-6 at 11 (broker's testimony that she and Ms. Bergman "were thrown [o]nto the floor"). On impact, multiple pieces of electronic equipment were dislodged from the center console, *id.*, though that could also be attributable to the fact that Mr. Moffitt was in the process of reattaching the electronics to the center console at the time of the sea trial, DE 32-2 at 18. The entire incident "happened pretty quickly." DE 32-1 at 21.

After Mr. Moffitt regained control of the vessel, he "turned the boat around" and headed back to the Moffitt residence. DE 32-2 at 44. The Bergmans moved forward with the purchase of the Palmetto 33. *Id.* at 45.

In the immediate aftermath of the incident, Ms. Bergman "was real nauseous and had a headache." DE 32-1 at 24. And after a week, she began to experience hip pain, back spasms, and tightness running from her shoulder blades around her chest. *Id.* at 24-25. She has since received care from her primary care physician and a pain management clinic. *Id.* at 26-32.

## II. Procedural History

Invoking this court's admiralty jurisdiction, Ms. Bergman instituted this federal action on June 12, 2023. DE 1. She alleges that Mr. Moffitt was negligent by (1) failing to operate the vessel at a safe speed, (2) failing to keep the vessel under proper control, (3) failing to keep a proper lookout, and (4) operating the vessel recklessly and without due care. *Id.* at 4. Even though Ms. Moffitt was not present for the sea trial, Ms. Bergman alleges that she is also liable by virtue of "respondeat superior." *Id.* at 3.

After the close of discovery, Defendants moved for summary judgment. DE 31. First, Defendants argue that "there are no viable claims against" Ms. Moffitt because she "was not on

5

board during the sea trial." *Id.* at 1. Next, Defendants contend that a reasonable factfinder could only conclude that the vessel hit unforeseeable rogue waves, so Mr. Moffitt was not negligent. *Id.* Defendants then assert that there is no evidence "to establish the scope of duty owed" or evidence "that establishes a breach of any duty owed." *Id.* Defendants have not advanced any argument that Ms. Bergman assumed the risk inherent in a sea trial or was contributorily negligent. *See id.*

In response, Ms. Bergman avers that Ms. Moffitt remains liable because she was the sole owner of the vessel and therefore appointed Mr. Moffitt as her agent to conduct the sea trial. DE 33 at 12-16. Ms. Bergman next rejoins that, taking the evidence in the light most favorable to her, a reasonable factfinder could conclude that Mr. Moffitt negligently operated the vessel. *Id.* at 16-22. Ms. Bergman then counters Defendants' assertion that she failed to identify the scope of Mr. Moffitt's duty or evidence supporting a breach of that duty. *Id.* at 22-30. Lastly, Ms. Bergman suggests that summary judgment should instead be granted in her favor. *Id.* at 30.

## III. Standard of Review

### a. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). At this stage, the court must not "weigh the evidence and determine the truth of the matter but [merely] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining the existence of a genuine issue of material fact, the court "draw[s] all reasonable

inferences in favor of the non-moving party." *Emmons v. City of Chesapeake*, 982 F.3d 245, 250 (4th Cir. 2020).

Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Anderson*, 477 U.S. at 252. To that point, a party's "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987), and any inference drawn in the non-movant's favor must not be "so tenuous that it rests merely upon speculation and conjecture," *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982)).

With those principles in mind, the moving party ultimately need not "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rather, "the burden on the moving party may be discharged by showing... that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks omitted). When the movant does so, the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). A showing of specific facts requires "cit[ation] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The existence of "some metaphysical doubt as to the material facts [does not suffice]." *Matsushita*, 475 U.S. at 586.

b. Negligence

Familiar standards of negligence apply to claims under maritime law; Ms. Bergman "must show: 1) the existence of a duty of care; 2) the breach of that duty of care; 3) the breach of duty proximately caused the resulting injury; and 4) actual loss, injury, or damage." *Matter of Lava*

7

*Ocean Tours Inc.*, No. 19-CV-00023, 2021 WL 2599664, at *2 (D. Haw. Jan. 20, 2021). "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). The scope of this duty depends on "the circumstances of each case." *Id.* at 632. "Differing circumstances necessitate different levels of degree of care." *Petition of Catalina Cruises, Inc.*, 930 F. Supp. 1384, 1391 (C.D. Cal. 1996). Relevant circumstances include "the experience of the crew, the type of carrier involved, the dangers to the passengers peculiar to that type of carrier, the carrier's degree of control over the passengers, and the carrier's ability to take precautions against such dangers." *Smith v. S. Gulf Marine Co. No. 2*, 791 F.2d 416, 421 (5th Cir. 1986).

When a passenger is injured on a vessel, the operator at times asserts a "rogue wave" defense. A rogue wave "is a peril of nature or an act of God for which [the vessel operator] cannot be responsible." *Petition of Catalina Cruises*, 930 F. Supp. at 1386. In other words, "an unpredictable freak swell of the sea" is "not the result of any fault on the part of the ship." *Irwin v. United States*, 236 F.2d 774, 776 (2d Cir. 1956) (internal quotation marks omitted). But "[c]ourts tend to reserve determination of the cause of a plaintiff's injuries—whether it be negligence or an unpredictable force of nature—for the trier of fact." *Stanley v. Starfleet Marine Transportation, Inc.*, No. 16-CV-13753, 2018 WL 3632354, at *2 (E.D. La. July 31, 2018); *see also Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 813 (9th Cir. 2002) (observing that "summary judgment is rarely granted" in maritime negligence cases because determining whether "the defendant acted reasonably is ordinarily a question for the trier of fact"); *Schoenfeldt v. Schoenfeldt*, No. 13-CV-5468, 2014 WL 1910808, at *3 (W.D. Wash. May 13, 2014) ("Questions

8

of forseeability [sic] and causation in [maritime] negligence cases particularly lend themselves to resolution by a jury.").

### IV. Analysis

#### a. Jurisdiction[2]

This court's "judicial power" extends "to all cases of admiralty and maritime jurisdiction." U.S. Const., Art. III § 2. "Congress has embodied that power in a statute," *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995), which provides that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(a)(1). "[A]dmiralty jurisdiction over maritime torts depends on" two factors: (1) "the location of the tort" (specifically, "whether it occurs on navigable waters," and (2) the tort's "relation to traditional maritime activity." *Baltimore Gas & Elec. Co. v. Coastline Com. Contracting, Inc.*, 107 F.4th 264, 268 (4th Cir. 2024), *cert. denied*, No. 24-397, 2024 WL 5112299 (U.S. Dec. 16, 2024). Courts refer to the tort's location and relation to maritime activity as "the *locus* and the *nexus* criteria." *Mullenix v. United States*, 984 F.2d 101, 104 (4th Cir. 1993) (italics in original).

A water is navigable for purposes of the locus criterion of maritime jurisdiction when it is capable of bearing commercial navigation. *Price v. Price*, 929 F.2d 131, 134 (4th Cir. 1991); *Mullenix*, 984 F.2d at 104. The Beaufort Inlet meets the locus test because it is a tidal water that connects to the Atlantic Ocean. *See Baltimore Gas*, 107 F.4th at 269 ("tidal waters remain the prototypical navigable waters and firmly fall within the ambit of federal admiralty jurisdiction"). And when the alleged wrong "involves the negligent operation of a vessel on navigable waters,"

---

[2] Federal "courts must always assure themselves of subject matter jurisdiction before reaching the merits." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

9

the tort "has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982). This case involves the allegedly negligent operation of a vessel in navigable waters, and thus satisfies both the locus and nexus criteria of admiralty jurisdiction. 28 U.S.C. § 1333(a)(1).

### b. Ms. Moffitt's Liability

Turning to the merits, Defendants first argue that there is no viable claim against Ms. Moffitt because she was not present on the vessel during the sea trial and there are no facts supporting a principal/agent relationship between her and her husband. DE 32 at 3. This argument has merit. Although there is a genuine issue of fact as to whether the Moffitts were co-owners of the vessel, or whether Ms. Moffitt was the sole owner, this fact is *not material* because Ms. Bergman has not identified any record evidence supporting the existence of an agency relationship.

Defendants contend that the Moffitts were co-owners of the vessel, meaning that Mr. Moffit retained independent authority to conduct the sea trial and was not acting as Ms. Moffitt's agent. DE 32 at 3. Mr. Moffitt also testified during his deposition that he and Ms. Moffitt "both" owned the vessel. DE 32-2 at 9. But when Ms. Bergman alleged in her Complaint that the Moffitts co-owned the vessel, DE 1 at 1, Defendants denied that allegation, DE 16 at 5. And, when the Moffitts acquired the vessel in 2013, Ms. Moffitt is the only buyer listed on the bill of sale. DE 33-7 at 2. Likewise, when the Bergmans purchased the vessel in 2020, Ms. Moffitt is the only seller listed on the bill of sale. *Id.* at 3. Further, a United States Coast Guard Certificate of Documentation listed Ms. Moffitt as the sole owner of the vessel. DE 33-8 at 1.

Thus, there is conflicting record evidence regarding the vessel's ownership. But this conflict is immaterial because, even if Ms. Moffitt was the sole owner of the vessel, there is no evidence supporting that she appointed Mr. Moffitt as her agent to conduct the sea trial.

10

"Federal maritime law embraces the principles of agency." *Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.*, 709 F.2d 663, 665 (11th Cir. 1983). And "[t]he Restatement (Second) of Agency has been adopted in maritime law as an accurate statement of applicable general agency principles." *US Wind Inc. v. InterMoor, Inc.*, 640 F. Supp. 3d 390, 401 (D. Md. 2022). Per the Restatement (Second), "[a]n agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." RESTATEMENT (SECOND) OF AGENCY § 15 (1958); *see also id.* at § 27 (explaining that apparent authority requires "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him"). Although "[a] husband or wife can be authorized to act for the other party to the marital relation," *id.* at § 22, "[n]either husband nor wife by virtue of the relation has power to act as agent for the other," *id.* at § 22 cmt. b.

Here, the record contains a dearth of evidence to support that Ms. Moffitt appointed Mr. Moffitt as her agent to conduct the sea trial. Ms. Bergman contends that Mr. Moffitt conducted the sea trial "with the knowledge of" Ms. Moffitt because Ms. Moffitt "was present when the sea trial began." DE 33 at 15. But the only evidence Ms. Bergman cites as support is her own deposition, where she indicated that Ms. Moffitt was *inside* the Moffitt home on the day of the sea trial, that they said "hi, hello, nice to meet you" in the home, and that Ms. Moffitt stayed "at the house with their two daughters" while the rest of the group walked down to the dock and departed on the sea trial. DE 32-1 at 46.

To reiterate, Ms. Moffitt was "in the house." *Id.* There is no evidence that she was outside by the dock, observed the group board the vessel and leave for the sea trial, or had any idea that

11

Mr. Moffitt would be operating the vessel during the sea trial. *See id.* In fact, multiple individuals testified that one of the brokers normally conducts the sea trial, and Ms. Bergman has not identified any evidence to suggest that Ms. Moffitt was aware that the July 3 sea trial would deviate from that typical arrangement. DE 32-2 at 17; DE 33-6 at 7. Ms. Bergman's "[u]nsupported speculation" to the contrary "is not sufficient to defeat a summary judgment motion." *Felty*, 818 F.2d at 1128.

In the absence of evidence supporting the existence of a principal-agent relationship, the dispute over the vessel's ownership is not material and Defendants are entitled to judgment as a matter of law on Ms. Bergman's claim against Ms. Moffitt. *See Gogel v. Maroulis*, 689 F. Supp. 3d 73, 81 (D. Md. 2023) (entering summary judgment and holding that wife/co-owner of vessel was not liable for her husband's acts when she was not present on trip and had no reason to know manner in which husband would conduct voyage).

c. Mr. Moffitt's Liability

Next, Defendants make two arguments to support that summary judgment must be entered on Ms. Bergman's negligence claim against Mr. Moffitt. DE 32 at 3. First, they assert that Ms. Bergman conceded that the accident "was caused when the vessel hit a rogue wave." *Id.* Second, they contend that "[t]here is no evidence that [Mr.] Moffitt could have anticipated this wave." *Id.* The court addresses each argument in turn.

First, as to Ms. Bergman's purported concession, her deposition testimony does include her statement that the vessel "caught two rogue big waves." DE 32-1 at 19. But the court has detailed previously that "rogue wave" is a term of art in maritime law. *E.g.*, *Petition of Catalina Cruises*, 930 F. Supp. at 1386; *Irwin*, 236 F.2d at 776. Ms. Bergman had limited boating experience. DE 33-5 at 7 (interrogatory response that Ms. Bergman "took a boater safety class"

12

in high school). At the time, she "was not looking for a boat"; her husband was the one interested in purchasing the vessel, and she "was just married to the man that insisted on having a boat." DE 32-1 at 11. And when the vessel struck two waves in rapid succession, Ms. Bergman "wasn't really looking forward to where" the vessel was "going." *Id.* at 21.

Placed in appropriate context, a reasonable factfinder could conclude that Ms. Bergman used the term rogue wave in the colloquial (not technical) sense, meaning that the vessel striking two waves in rapid succession was an unexpected occurrence *to her*, not that the waves were an unforeseeable risk *to Mr. Moffitt*. *See id.* at 19. Just as importantly, Defendants may not use Ms. Bergman's deposition testimony to establish that the waves were "rogue waves" as that term is used in maritime law; lay witness testimony is inadmissible when it employs a term that has "a separate, distinct and specialized meaning in the law different from that present in the vernacular." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). For those reasons, the court finds that Ms. Bergman's use of the term "rogue wave" in her deposition does not require the conclusion that the incident involved an unforeseeable "act of God." *Petition of Catalina Cruises*, 930 F. Supp. at 1386.

Second, Defendants argue that Mr. Moffitt could not have anticipated the waves. DE 32 at 3. Viewing the evidence in the light most favorable to Ms. Bergman and drawing every reasonable inference in her favor, the court is not convinced. To restate the pertinent facts:

1. Mr. Moffitt was navigating the vessel through Beaufort Inlet on the Friday of a summer holiday weekend, and there was a significant amount of boat traffic;
2. There were strong winds and the water was choppy;
3. The tide was ebbing from the inlet out to the ocean, which creates steeper swells;

4. Mr. Moffitt stated that he was going to increase the speed of the vessel to demonstrate how it handled choppy water, and was navigating the vessel faster than the broker would have in light of the conditions;

5. Two sport fishing boats were passing by on either side of the vessel at a point where the channel narrows, and it was "tight";

6. Large sport vessels create large wake;

7. Mr. Moffitt was navigating the vessel at a speed of nearly 30 miles per hour and did not decrease his speed when passing between the sport fishing boats;

8. Mr. Moffitt was talking to Mr. Bergman about the vessel's electronics and could not recall whether that conversation diverted his attention;

9. The vessel hit two waves in rapid succession and "there w[ere] no more [waves] like that"; and

10. The second wave catapulted Ms. Bergman out of her seat and onto the deck.

DE 32-1 at 16, 18-21; DE 32-2 at 28-31, 36-37, 41-42; DE 33-6 at 10-11, 18-19.

Construing those facts in the light most favorable to Ms. Bergman, there is a genuine dispute of material fact as to whether the vessel struck two "rogue" waves, or whether it struck wake from the sport fishing boats. *See* DE 33-6 at 11 (broker's testimony that Mr. Moffitt "must [have] stuffed it into a wake"); DE 32-2 at 36-37 (Mr. Moffitt's testimony that two sport fishing boats had just passed the vessel prior to collision with two waves). Unlike a rogue wave, large wake from passing boats is both foreseeable and avoidable. *See* DE 33-6 at 19 (broker's testimony that, where "there's a ton of boats going by, you'll have large wake"). There is likewise a genuine dispute of material fact concerning whether Mr. Moffitt kept a proper lookout, or whether his

conversation with Mr. Bergman diverted his attention. *See* DE 32-2 at 37 (Mr. Moffitt's testimony that he could not "recall . . . a diversion or anything like that").

Defendants attempt to liken this case to *Southard*, but that comparison is inapt. In *Southard*, the plaintiff brought a maritime negligence action against the defendant captain after the plaintiff was injured on a fishing charter when the vessel struck what the defendant described as a rogue wave near the Oregon Inlet. *Southard v. Paul Lester & Oregon Inlet Fishing Ctr., Inc.*, No. 2:05-CV-47, 2006 WL 8449039, at *1 (E.D.N.C. Oct. 12, 2006), *aff'd sub nom. Southard v. Lester*, 260 F. App'x 611 (4th Cir. 2008). The District Court entered summary judgment in the defendant's favor, and the Fourth Circuit affirmed. *Id.* at *6; *see also Southard v. Lester*, 260 F. App'x 611, 615 (4th Cir. 2008).

But there are two material differences between the evidence in *Southard* and the record in this case. First, because the conditions in *Southard* were choppy, the defendant "slowed his speed to 18 knots, three to five nots [sic] off the [vessel's] usual 21-23 knot cruising speed." *Southard*, 2006 WL 8449039, at *3. Unlike in *Southard*, here the record reflects that Mr. Moffit *increased* his speed to 25 knots in response to the choppy conditions. DE 32-1 at 18-19; *see also* DE 33-6 at 10.

Second, and more critically, the defendant's testimony in *Southard* that a large wave suddenly appeared right in front of the vessel was "the only evidence in the record with regard to the timing and formation of the 'rogue' wave." *Southard*, 2006 WL 8449039, at *5. Unlike in *Southard*, where the passengers were below deck in the cabin and there were no other vessels around, the record in this case plausibly permits the inference that Mr. Moffitt did not strike a rogue wave, but rather wake from sport fishing boats that passed on either side of the vessel immediately prior to its collision with two waves. DE 32-2 at 36-37; DE 33-6 at 11, 19. Thus, the

15

factfinder here would not need to "rely upon sheer speculation and conjectural hypothesizing to conclude that [Mr. Moffitt] breached his duty of reasonable care when he failed to avoid the 'rogue' wave." *Southard*, 2006 WL 8449039, at *5; *see also* DE 33-6 at 19 (broker's testimony that, where "there's a ton of boats going by, you'll have large wake"). *Southard* is not persuasive authority on this distinguishable factual record.

The record in this case, taken in the light most favorable to Ms. Bergman, more closely resembles a significant body of case law in which rogue wave defenses were resolved at trial, and not summary judgment. *E.g.*, *Stanley*, 2018 WL 3632354, at *2 (explaining that it is rarely "appropriate to grant summary judgment" on rogue wave defense); *Christensen*, 279 F.3d at 813; *Schoenfeldt*, 2014 WL 1910808, at *3 (emphasizing that summary judgment is rarely granted in maritime negligence cases and that jury is best positioned to resolve whether incident occurred due to negligence or act of God); *Buccina v. Grimsby*, 261 F. Supp. 3d 842, 843 (N.D. Ohio 2017) (concluding after trial that operation of vessel in trafficked and choppy waters at 20 miles per hour breached standard of care); *Winfield v. Pac. Longline Co. LLC*, No. 12-CV-861, 2013 WL 1015427, at *3 (W.D. Wash. Mar. 14, 2013) (holding that conflicting evidence regarding whether ship collided with rogue wave compelled denial of summary judgment); *Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206, 1211–12 (W.D. Wash. 2003) (determining that jury must resolve whether cruise ship hit rogue wave or executed dangerous turn in rough conditions); *cf. Hines*, 487 F. App'x at 62 (affirming trial court's finding that defendant's operation of 22-foot vessel at 15-20 miles per hour over oncoming waves of four to five feet breached duty of care). The foregoing authority militates in favor of denying Defendants' motion for summary judgment and letting this matter proceed to trial, where a factfinder may both assess witness credibility and scrutinize all the evidence neutrally, and not in a light favorable to either party.

16

### d. Evidence Regarding the Scope of Duty and Breach

Lastly, Defendants move for summary judgment on the basis that Ms. Bergman "has no evidence establishing the standard of conduct required," and that, "[b]ecause [she] has failed to identify the duty owed, she has no evidence of a breach of this duty." DE 32 at 4. Defendants do not cite any authority in support of these blanket assertions, and they are not persuasive.

For the same reasons the court finds that there are genuine issues of material fact concerning the vessel's collision with two waves on July 3, 2020, it likewise concludes that the available record permits it to articulate a duty of care and identify evidence in the record plausibly indicating a breach of that duty. As noted, "[i]t is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel." *Kermarec*, 358 U.S. at 630. The scope of this duty depends on "the circumstances of each case." *Id.* at 632; *see also Petition of Catalina Cruises, Inc.*, 930 F. Supp. at 1391; *Smith*, 791 F.2d at 421. To establish the duty of care, Ms. Bergman may rely on "the demands of reasonableness and prudence." *In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 211 (3d Cir. 2013). Reasonableness and prudence require the captain to operate the vessel in a safe manner and maintain a proper lookout. *Proctor v. Tsao*, 164 F.3d 625 (Table), 1998 WL 70868, at *5 (4th Cir. 1998); *Buccina*, 261 F. Supp. 3d at 849. The scope of this duty aligns with the allegations in Ms. Bergman's Complaint. *See* DE 1 at 4.

There is also sufficient circumstantial evidence in the record to permit a reasonable factfinder to infer that Mr. Moffitt breached his duty of care. To briefly recapitulate the factual record in the light most favorable to the non-moving party, Mr. Moffitt operated the vessel at or above planing speed through Beaufort Inlet when the conditions were choppy, there was significant boat traffic, and Mr. Moffitt passed between two large sport fishing boats right before

17

striking two waves in quick succession. *E.g.*, DE 32-1 at 16, 18-21; DE 32-2 at 28-31, 36-37, 41-42; DE 33-6 at 10-11, 18-19. The broker, another experienced boater, testified that Mr. Moffitt was navigating faster than she would have, and that he likely "stuffed it into a wake." DE 33-6 at 10-11. And at the time of the incident, Mr. Moffitt was conversing with Mr. Bergman and does not recall whether the conversation diverted his attention. DE 32-2 at 37. Mr. Moffitt, for his part, swears that the two waves were "unforesee[able]." *Id.* at 29.

This factual recitation does not provide conclusive evidence that Mr. Moffitt breached his duty of care. But it is more than a mere "scintilla of evidence," and at this stage the court must not "weigh the evidence and determine the truth of the matter but [merely] determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249 & 252. Construed in the light most favorable to Ms. Bergman, the record evidence presents genuine issues for trial. For the foregoing reasons, the court finds that Defendants are not entitled to summary judgment on Ms. Bergman's claim against Mr. Moffitt.[3]

### e. Ms. Bergman's Request for Summary Judgment

In concluding her brief in opposition to Defendants' motion for summary judgment, Ms. Bergman asserts that "[s]ummary judgment for the Plaintiff, non-movant, should be granted pursuant to Fed. R. Civ. P. Rule 56(f)(1)." DE 33 at 30. As this order's analysis makes clear, genuine issues of material fact make this case one for trial. Just as a factfinder could infer based on the circumstantial evidence that Mr. Moffitt failed to operate the vessel at a safe speed or

---

[3] In their reply brief, Defendants argue for the first time that Ms. Bergman cannot prove that Mr. Moffitt breached the standard of care without "expert testimony." DE 34 at 2. But "new arguments cannot be raised in a reply brief." *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013). And, in any event, "expert testimony is not necessary to establish negligence" in maritime cases "'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge.'" *Felton v. Felton*, 181 F.3d 87 (Table), 1999 WL 381814, at *3 (4th Cir. 1999) (quoting *Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir.1982)).

18

maintain a proper lookout, a factfinder could just as equally credit his testimony that the waves were unforeseeable and unavoidable rogue waves. Ms. Bergman's request for summary judgment is denied.

## V. Conclusion

Defendants' motion for summary judgment [DE 31] is GRANTED IN PART and DENIED IN PART. Judgment is entered in favor of Defendants as to Ms. Bergman's claim against Ms. Moffitt, and Ms. Bergman's claim against Mr. Moffitt will proceed to a bench trial.[4] The court will issue a separate trial scheduling order.

SO ORDERED this 11th day of April, 2025.

_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] *See In re Lockheed Martin Corp.*, 503 F.3d 351, 354-55 (4th Cir. 2007); Fed. R. Civ. P. 9(h) & 38(e); DE 1 at 1.

19